# COURT OF APPEALS OF VIRGINIA

---

### Record No. 0100-25-2

---

RON NELSON BLUE

v.

COMMONWEALTH OF VIRGINIA

---

Present: Chief Judge Decker, Judges Beales and Athey

Argued by videoconference

Opinion Issued August 4, 2026[*]

---

### FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Clarence N. Jenkins, Jr., Judge

Gregory Sheldon[1] (Michael B. Gunlicks; Gunlicks Law, L.C., on brief), for appellant.

Jason D. Reed, Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

---

### MEMORANDUM OPINION BY
### JUDGE CLIFFORD L. ATHEY, JR.

Following a jury trial held in the Circuit Court of the City of Richmond ("trial court"), Ron Nelson Blue ("Blue") was convicted of first-degree murder and use of a firearm in the commission of a felony. On appeal, Blue assigns error to: 1) the trial court admitting in evidence surveillance footage of the incident; 2) the trial court finding the evidence sufficient to convict him; 3) trial counsel ineffectively assisting in his defense; and 4) "[t]he [t]rial [c]ourt's finding of guilt [that] violate[s] the ends of justice." Finding no error, we affirm Blue's convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] On May 21, 2025, after briefing was concluded, we granted Michael B. Gunlicks's motion to withdraw as counsel. The trial court subsequently appointed Gregory Sheldon as appellate counsel on May 30, 2025.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

## I. BACKGROUND[3]

On March 7, 2022, Blue was indicted on charges of 1) first-degree murder, in violation of Code § 18.2-32; 2) use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1; and 3) possession of a firearm by a non-violent felon within 10 years, in violation of Code § 18.2-308.2.[4] He was tried by a jury on November 21, 2022.

After the parties conducted voir dire, selected a jury, and gave their opening statements, the Commonwealth called Officer David Goodwin ("Officer Goodwin"). He testified that on February 17, 2022, he arrived at the 1400 block of Jennie Scher Road in the city of Richmond. There, he observed the victim, D.C.,[5] lying on the sidewalk at the base of a staircase with a gunshot wound to the head.

The Commonwealth next called Investigator Jessica Bourne of the Richmond Police Department ("Bourne"), who testified that she arrived at the same location and subsequently photographed the scene of the shooting, including the body of D.C. She testified that D.C. had "red staining to his head" and that D.C. was wearing a hat that had a hole in it. Investigator Bourne also recalled that she found a 9mm firearm lying underneath D.C.'s arm, which she labeled and secured as evidence at the scene. The Commonwealth then introduced both the 9mm firearm and other photographs taken by Investigator Bourne in evidence.

---

[3] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

[4] The firearm possession charge was severed from the other two charges and is not before this Court on appeal.

[5] We use initials to protect the victim's privacy.

The Commonwealth then called Lauren Claytor ("Claytor"), a forensic scientist employed in the firearm and toolmark section of the Virginia Department of Forensic Science, as an expert witness. She testified that she examined bullet fragments from D.C.'s body as well as the 9mm firearm found at the scene underneath D.C.'s body. Claytor opined that the bullet that killed D.C. had not been fired from the 9mm firearm. She also drew the same conclusion regarding a separate firearm that law enforcement submitted for analysis.

The Commonwealth next called Detective Austin Darnell of the Richmond Police Department ("Detective Darnell"). He testified that after arriving at the crime scene, he was able to locate surveillance cameras that captured footage of D.C.'s murder. As a result of reviewing the video footage from the surveillance cameras located in the apartment complex, Detective Darnell explained to the jury that he disseminated a photograph from the video footage of a "vehicle of interest" that was observed near the crime scene. Detective Darnell then testified that he provided the photograph of the vehicle to law enforcement the day after D.C. was killed and further disseminated the photograph to the media on February 24. He then advised the jury that also on February 24, Jessie Blackwell ("Blackwell") met with Detective Darnell and identified the "vehicle of interest." Detective Darnell further explained that following the conversation with Blackwell, Blue was charged with the murder of D.C.

Blackwell testified that he knew Blue because they had worked together for several months. Blackwell advised the jury that on February 17, 2022, Blue came to Blackwell's house and the two "talked," "did some recreational drugs and stuff[,] [a]nd that was it." Blackwell testified that he and Blue then went to a store and were "just . . . riding around" in Blackwell's vehicle until Blue eventually asked Blackwell to take him "somewhere." Blackwell explained that he drove Blue to an apartment complex off of Jennie Scher Road in the city of Richmond. He recounted that when they arrived, Blue got out of Blackwell's vehicle and Blackwell "drove

around" and came back to pick up Blue. Blackwell further recalled Blue telling him that "he w[as]n't going to be long" when he got out of the vehicle and that "by the time [Blackwell] [would] come back, [Blue] [would] be there." Blackwell also explained to the jury that although Blue did not say exactly where he was going when he exited the vehicle, Blackwell was "pretty sure [Blue] was going to an apartment" in the complex. Blackwell further testified that after Blue got out of the car, Blackwell drove away but then had to stop because his car was "running hot." Blackwell then testified that after he pulled his car back around to where he had dropped Blue off, he saw Blue again, picked him up, and the two drove away.

The Commonwealth then played two video clips and asked if Blackwell could identify the vehicle and the person who got into it. The first video depicted a man walking across the apartment complex, walking down the staircase where D.C.'s body was found, and D.C. falling to the ground. After D.C. falls to the ground, the video shows a vehicle driving through the apartment complex. The second video clip overlaps partially with the first and showed the same man from the first video walking and jogging across the apartment complex and getting into the same vehicle from the first video.[6]

Blackwell initially stated that he could not see the person in the video; the Commonwealth then asked Blackwell to "come back out [of] the witness stand." After the first video clip played, Blackwell testified that the vehicle in the video was his. As to the second video clip, Blackwell testified that Blue was the person who entered it. The Commonwealth asked Blackwell if the "two video clips accurately describe[d] [him] driving through the apartment complex and picking up . . . Blue?" Blackwell agreed. The Commonwealth also

---

[6] The first video clip has two timestamps: one begins at "4:33:39 PM" and the other begins at "17:06:54." The final timestamps of the first video are "4:34:39 PM" and "17:07:54." The second video clip also contains two separate timestamps: the first begins at "4:34:25 PM" and the second begins at "17:10:55." All timestamps on both videos indicate they were recorded on February 17, 2022.

asked Blackwell if the videos "accurately reflect[ed] what happened on February 17th" of 2022, and Blackwell agreed. Blackwell further testified that when he picked Blue up again, he was "acting calm" as if "nothing happened." Blackwell also testified that Blue did not say anything to him upon reentering the vehicle.

When the Commonwealth sought to introduce the video footage in evidence, Blue objected, asserting that Blackwell "didn't identify anybody in the first video" clip. Blue then clarified his position by stating that he did not have an objection to the second video clip, just the first. Blue also objected to the first video clip because Blackwell said "he couldn't see any of the stuff that happened" and did not "hear any gunshot." The trial court did not rule on the objection but instead allowed the Commonwealth to ask Blackwell if he could identify Blue in the first video clip. After asking Blackwell whether he could identify the person in the first video clip who was "running across the grass," Blackwell said, "I can't hardly see it from here. But it's going to my car, that was . . . Blue." Blackwell then testified that the first video occurred at "the same time" that Blackwell was driving in the second video.

Blue renewed his previous objection, further arguing that the Commonwealth still had failed to establish the admissibility of the first video clip. Blue indicated to the trial court that he was "going to be asking for a mistrial at this point" if the Commonwealth showed the clips to Blackwell a third time. The trial court stated that the Commonwealth was "getting into bolstering [the] witness" and indicated that it was "not going to allow the first portion in" but would allow "the second portion" of the video in evidence. The Commonwealth then stated that it "thought [it] had satisfied the requirements for admissibility" and "stopped asking additional questions because [it] thought [it] had met the burden." The trial court then permitted the Commonwealth to further question Blackwell, including playing the video clips for him a third time.

Blackwell then testified that he did not leave the apartment complex after he dropped Blue off and that no one else got in his car. He also testified that he only drove through the apartment complex once. Blue objected again, raising similar arguments as to Blackwell's inability to authenticate the video. The Commonwealth asserted in response that Blackwell's ability to identify Blue in the second video made the first video clip admissible and that any gaps in Blackwell's testimony went to the weight to be given to the video clips, not their admissibility. The Commonwealth also referenced the timestamps on the videos, which indicated that the videos were from the same day and at similar overlapping times.

Ultimately, the trial court admitted the first video in evidence over Blue's objection because Blackwell could identify his vehicle in the video clip, testified that he only drove through the apartment complex once, and testified that the first and second video clips occurred at the same time.[7] The trial court also admitted the second video clip in evidence.

Blackwell further explained to the jury that he met with law enforcement after seeing the vehicle he drove in the video clips on the news. He also confirmed that Detective Darnell had spoken with him and that he cooperated with the law enforcement investigation. On cross examination, Blackwell stated that he had five previous felony convictions and three of his convictions were for crimes involving moral turpitude. He also conceded that he had consumed alcohol and drugs the day he gave Blue a ride.[8]

The Commonwealth next called Dr. Jeffrey Gofton ("Dr. Gofton"), assistant chief medical examiner for the Commonwealth of Virginia, who conducted D.C.'s autopsy. He

---

[7] Before the trial court addressed the jury with its ruling on Blue's objections, Blue indicated that he wanted to "fire" his counsel and "start over" with the trial. The trial court ultimately construed the discussions as a motion for Blue's counsel to withdraw. The trial court denied that motion and the case proceeded.

[8] The Commonwealth recalled Detective Darnell, who testified that the location of the person who was shot in the video was where Detective Darnell located D.C.'s body.

testified that D.C.'s cause of death was a gunshot wound to the head. He also testified that he had located bullet fragments during the autopsy, which were catalogued and then submitted for analysis. At the conclusion of Dr. Gofton's testimony, the Commonwealth rested.

Blue moved to strike, asserting that the evidence was insufficient to identify him as the individual who killed D.C. He also contended that the Commonwealth had presented insufficient evidence of premeditation, as it had not demonstrated "any source of any type of motive or reason for this happening." The Commonwealth responded that Blue was the individual depicted in both videos, as corroborated by Blackwell's testimony. In further support, the Commonwealth contended that the person in both videos was wearing the same clothing and the videos' timestamps overlapped with one another. The Commonwealth acknowledged that the interaction between Blue and D.C. was brief but noted that Blue "walked up to the victim[] and in three seconds[] shot him once in the side of the head and then ran away and hopped in a car and was taken away from the scene." The Commonwealth contended that, as a result, the evidence of Blue's intent to kill as well as evidence of malice could be inferred from the circumstances and Blue's use of a deadly weapon. The trial court denied the motion to strike.

Blue elected to not present any evidence in his defense. The jury was then instructed pursuant to agreed-upon jury instructions. After both parties made their closing arguments, the jury retired to deliberate. Following deliberations, the jury found Blue guilty of first-degree murder and use of a firearm in the commission of a felony. On July 24, 2023—after being appointed new counsel—Blue was sentenced to 70 years' incarceration, with 10 years suspended on his first-degree murder conviction, and 3 years' active incarceration for his use of a firearm in commission of a felony conviction. Blue appealed.[9]

---

[9] The trial court entered its final order on August 9, 2023. Blue filed a notice of appeal on August 18, 2023. This Court issued an order on February 2, 2024, noting that Blue's opening brief was due on January 18, 2024. Blue's counsel asked for an extension of time on January 29,

## II. ANALYSIS

### A. *Standard of Review*

"The admissibility of photographic and video evidence rests within the sound discretion of the trial court." *Baez v. Commonwealth*, 303 Va. 421, 434 (2024). "When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

---

2024, and filed an opening brief on February 1, 2024. This Court dismissed Blue's appeal. On August 1, 2024, Blue filed a motion for a delayed appeal, which was granted. The record indicates that the original August 9, 2023 sentencing order was amended nunc pro tunc and entered September 18, 2023. Blue identified and appealed this order in his second notice of appeal.

B. *The trial court did not abuse its discretion in admitting surveillance footage in evidence because Blackwell's testimony authenticated both videos.*

Blue concedes the admissibility of the second video where Blackwell identifies him but challenges the authenticity of the first video, asserting that the trial court erred in admitting it because it was not properly authenticated. We disagree.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. "Ordinarily, the admissibility of videotape films is governed by the same rules which apply to the admission of photographs or motion pictures." *Stamper v. Commonwealth*, 220 Va. 260, 271 (1979). Such evidence is "generally admitted into evidence for two purposes: to illustrate a witness' testimony, and as an 'independent silent witness' of matters revealed by the" evidence. *Bailey v. Commonwealth*, 259 Va. 723, 738 (2000). "[E]ither theory may serve as an independent basis for authenticating a photograph or video." *Baez*, 303 Va. at 437; *see Wilson v. Commonwealth*, 29 Va. App. 236, 239 (1999) ("Because a witness with knowledge testified that the videotape was what it claimed to be, the Commonwealth did not need to prove the accuracy of the process that produced it.").

When a video is used to illustrate a witness's testimony, if the video "is verified by the testimony of a witness as fairly representing what that witness has observed" then the video "is admissible in evidence and . . . it need not be proved by the [person] who made it." *Ferguson v. Commonwealth*, 212 Va. 745, 746 (1972). "[I]t is not necessary that a witness observe or testify to every moment depicted in the video. Rather, it is sufficient for a witness to affirm that the video accurately represents what transpired based on the witness's observations." *Baez*, 303 Va. at 435.

Here, Blackwell did not clearly identify Blue in the first video, the one that depicted the murder itself. But the date and timestamps at the end of the first video and the beginning of the second overlapped, and each video shares the common elements of the location, Blackwell's car,

and a man that appears to be Blue. Blackwell was able to identify his car in both videos and the date on the videos matched his testimony. He also identified Blue in the second video and testified that he only drove his car around the apartment complex once, as depicted in both videos. Thus, the trial court did not err in determining that the first video "is what its proponent claims," namely a depiction of the events surrounding D.C.'s murder. Va. R. Evid. 2:901. Accordingly, the trial court did not abuse its discretion in admitting the video.[10]

C. *The trial court did not err in denying Blue's motion to strike, as the evidence was sufficient to establish a prima facie case for first-degree murder.*

Blue asserts that the Commonwealth failed to identify him as the person who committed the crimes and that it failed to establish the element of malice.[11] We disagree.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003). Malice is "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947). It "is implied from any willful, deliberate and cruel act against another." *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991). It also "can be inferred from the deliberate use of a deadly weapon unless,

---

[10] In addition to his argument as to authentication, Blue argues on brief that the trial court "figuratively bent over backwards to change its initial determination that the video was inadmissible for failure to authenticate it." He also accuses the trial court of "reward[ing] the Commonwealth's laziness" and "go[ing] out of its way to rehabilitate the authentication of the video." But Blue does not cite any authority for these arguments and thus has waived this portion of his assignment of error. *See* Rule 5A:20 ("The opening brief of appellant must contain . . . the argument (including principles of law and authorities) relating to each assignment of error."); *Buchanan v. Buchanan*, 14 Va. App. 53, 56 (1992) ("Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration.").

[11] Blue's assignment of error asserts that the Commonwealth failed to establish the killing was premeditated. But he provides no argument or authority on this point and thus has waived it. Rule 5A:20.

from all the evidence, there is a reasonable doubt as to whether malice existed." *Williams v. Commonwealth*, 64 Va. App. 240, 251 (2015).

Here, Blackwell testified that Blue asked him to take him to the apartment complex where D.C. was shot. Blue told Blackwell that "he w[as]n't going to be long." The video footage depicts a man walking up to D.C. in public and shooting him in the head from a few feet away. The same man, later identified as Blue, then immediately jogged and walked back to Blackwell's car, quickly leaving the scene. Blue's use of a deadly weapon and the surrounding circumstances, viewed in the light most favorable to the Commonwealth, was sufficient for the jury to determine that the killing was done with malice. Furthermore, the evidence before the trial court was sufficient for a reasonable factfinder to determine that Blue was the killer depicted in the first video. Blackwell identified Blue as the person walking to his car in the second video, and Blue testified that the videos overlapped with each other, as demonstrated by the videos' timestamps. The first video, which depicts Blue shooting D.C., was therefore sufficient evidence on which the jury could have convicted Blue. Blackwell's identification of Blue and testimony was presented to the jury for their determination as to its credibility. *See Fordham v. Commonwealth*, 13 Va. App. 235, 240 (1991) ("The credibility of the witnesses and the weight to be accorded their testimony lies wholly within the purview of the jury."). Accordingly, the trial court did not err in denying Blue's motion to strike.[12]

---

[12] Blue argued on brief that his trial counsel was ineffective in defending him at trial, but Blue's new counsel at oral argument withdrew this assignment of error. Furthermore, Blue's remaining assignment of error asserts that the "[t]rial [c]ourt's finding of guilt violated the ends of justice." He invokes Rule 5A:18 and asks us to reach his same sufficiency and ineffective assistance of counsel arguments, but under the Rule's "good cause" and "ends of justice" exceptions. As we hold that Blue's operative sufficiency arguments were preserved by his objections and motion to strike, we have no need to apply any of Rule 5A:18's exceptions in analyzing his sufficiency arguments and reject them for the reasons noted above.

## III. CONCLUSION

For the foregoing reasons, we affirm Blue's convictions.

*Affirmed.*